**2025 UT App 107**

# THE UTAH COURT OF APPEALS

OREM CITY,
Appellee,
*v.*
DAVID AMMON JAKEMAN,
Appellant.

Opinion
No. 20231059-CA
Filed July 10, 2025

Fourth District Court, Spanish Fork Department
The Honorable Jared Eldridge
No. 221300408

David Ammon Jakeman, Appellant Pro Se

D. Jacob Summers, Attorney for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN M. HARRIS
concurred.

MORTENSEN, Judge:

¶1 David Ammon Jakeman was convicted of child abuse and violation of a protective order related to an incident in which he kneed his daughter in the thigh. He had threatened to hit her because she had hurt his feelings by telling him he was being manipulative, and then he made good on his threat. He complains that there was insufficient evidence to support the conviction for child abuse, that the trial was plagued by structural error because his transport to the courthouse from the jail was delayed, and that his trial counsel rendered ineffective assistance by failing to communicate with him and by failing to adequately question witnesses. None of these claims of error have merit, and we therefore affirm Jakeman's convictions.

BACKGROUND[1]

¶2    Prior to the incident in question, Jakeman had been meeting with multiple therapists on a weekly basis and attending anger management classes. He also had been taking medication to address a psychological condition. When he did not take his medication, he would become "snappy," "impulsive," and "frustrated" with his family. Jakeman's family had a "plan of safety" for when he was "not calm." This involved having a code word that his wife (Wife) and children would use to communicate to Jakeman that they felt unsafe around him. That plan entailed that Jakeman, upon hearing the word, "would get up and walk out" of the vicinity. However, Wife revealed that "whenever it was actually crisis time," Jakeman would refuse to leave when asked to do so: "It always had to be on his terms and when he wanted to go." Indeed, a protective order was imposed on Jakeman in September 2020, preventing him from committing, trying to commit, or threatening "to commit any form of violence," including "threatening, physically hurting, or causing any other form of abuse," against Wife or any of their seven children.

¶3    On a May morning in 2022, Jakeman, who had been sleeping in his car in the driveway of the family home, was awakened by a phone call from Wife. She asked him to come inside and take care of the children because she wanted to get some rest. When Wife noticed that he was being "snappy" with their son, JJ (age ten), she asked Jakeman if he had taken his medication. When he said he hadn't, she asked him to do so because she was concerned about the way he was acting with JJ.

---

1. "On appeal from a bench trial, we view and recite the evidence in the light most favorable to the trial court's findings; we present additional evidence only as necessary to understand the issues on appeal." *State v. Jack*, 2018 UT App 18, n.2, 414 P.3d 1063.

¶4      While Wife was sleeping, one daughter, HJ (age twelve), told her older sister, AJ (age seventeen), that Jakeman was "being really . . . mean and scary" and was not listening to her when she told him that she was not feeling "very safe." After listening to Jakeman "being really aggressive," AJ intervened. Standing at the top of some stairs in the house, AJ began arguing with Jakeman, telling him that he was being manipulative. Jakeman responded by telling AJ, "[I]f you don't leave I'm going to come up and hit you." Jakeman then went up the stairs and "cornered" AJ against a wall. AJ testified that Jakeman had "at least one hand on" her, while she tried to "create distance" by putting her hand on his chest and telling him that he needed to back away and leave. When AJ again told Jakeman that he was being manipulative, "he just kind of blew up." Jakeman then "forcibly" moved AJ down the hallway. Jakeman ended the confrontation when he "hit" AJ's leg with his leg. AJ said the blow "hurt really badly" and resulted in debilitating pain: "I know I was on the ground at one point, and I got up, and I was crying." Jakeman left the house, while Wife attempted to comfort AJ. AJ recalled that she didn't want to be touched because she was in "so much pain." Wife called the police.

¶5      Police then contacted Jakeman, who had taken JJ to a nearby pond to fish. The encounter was recorded on a body camera, and the recording was admitted at trial. Police asked Jakeman what had happened, and Jakeman explained that he and AJ had been involved in an argument about whether he was being manipulative. Unprompted, JJ then interjected, "And you hit her" and "shoved her into the wall." Jakeman initially denied hitting, kicking, or pushing AJ, but he later admitted to police that he and AJ were touching and that there may have been some "[p]ushing back and forth." Jakeman was arrested and charged with child abuse and violation of the existing protective order, and the case proceeded to trial.

¶6    On the day of his bench trial, Jakeman was apparently late in being transported to the courthouse from the jail. The trial was scheduled to begin at 1:00 p.m., but the trial did not actually begin until 2:15 p.m. Still, Jakeman met with his attorney (Counsel) outside the courtroom before trial. During their meeting, Counsel "seemed really upbeat and confident" and informed Jakeman that she had recently found helpful caselaw. Given her confidence, Jakeman felt comfortable proceeding with the trial.[2]

¶7    At the bench trial, AJ testified consistently with the facts recited above. AJ clarified in her testimony that she initially thought that Jakeman had "kicked" her, but, upon further consideration, she realized that he had "kneed [her] in [her] right thigh." She also testified that the contact to her thigh was "super painful when it happened" and that, in the days following the incident, a bruise developed at the place of impact. She took photos of the bruise, which were admitted into evidence. AJ further testified that she initially thought Jakeman had shoved her head, but she was "a little foggy" about that aspect: "So my head was never hit against the wall, and I didn't claim that it was. . . . I was trying to say [that] he'd shoved my head and moved me along the wall when I made that report. Then I remember afterwards being like well, my head doesn't hurt, so is that really what happened?" AJ also conceded that some of what she was testifying to at trial was based on what Jakeman had posted online or what others had told her: "Everything is something that someone else told me and I've specifically clarified. So I remember being moved. I remember him hitting me in the leg. I remember being on the other side of the hallway, and I remember . . . him [cornering] me and all the events before that."

_____

2. We will recount other facts relevant to Counsel's pre-trial consultation and contact with Jakeman in the Analysis section below.

¶8    Jakeman testified in his own defense at trial. He stated that on the morning of the incident, he and HJ "were being rude to each other." And he "realized" that he "felt emotionally unsafe" because of the way HJ, who was only twelve years old, was talking to him. When he attempted to talk to HJ about how her behavior made him "feel unsafe," Jakeman said that AJ came "charging . . . in a totally aggressive manner and in an aggressive tone," saying, "No, you're just being manipulative. You need to leave." Feeling "totally hurt," Jakeman retorted, "No. If anybody's going to leave . . . , it's going to be you." Jakeman said he then went up the stairs to where AJ was standing. He testified that they "stood there in a standoff," while he was thinking, "I'm doing a stupid, dumb thing and I'm trying to win because I'm all hurt and now I'm going to be prideful about it or whatever." He said that he then "started to raise [his arms] first," prompting AJ to raise "hers automatically, like subconsciously." Again, Jakeman stated, "I had just had my feelings hurt, and so I'm going to win this little standoff . . . ." Jakeman testified that he remembered coming to the following realization while his arms were locked with AJ's:

> I notice holy cow, this girl is so thin. I don't know why, but I noticed that. I'm like she is super thin, and she starts . . . shaking from side to side in a drastic manner . . . and . . . I'm like oh, crap. Like I think this girl's afraid, . . . and her eyes are closed, so I don't know if this is intentional or unintentional, but in my mind I'm not even mad anymore. I feel bad because she is . . . totally afraid of me, okay? I don't want her to be afraid of me, right? . . . [B]ut I'm still going to win this stupid standoff.

Jakeman continued testifying, "At this point I just want to be done. I feel terrible about the whole thing. My daughter's afraid of me, and I want to be done." In an effort to "safely disengage," Jakeman decided to "put [his] knee on her left thigh" and "apply

pressure." This move caused AJ to "drop[] to the ground." Jakeman said the move worked, but not how he wanted it to. He said AJ "dropped to the floor" and "let out a scream."

¶9 On cross-examination, Jakeman admitted he was "mad at AJ for saying that [he was] being manipulative." And he was asked about a statement he had emailed to friends, family, neighbors, and church members detailing his "side of the story."[3] He was asked if he wrote the following in that email:

1. "I told AJ that if she kept on as she was doing I would hit her."

2. "I knew saying this could get me in trouble."

3. "I placed my right knee on her exposed thigh and slowly applied pressure to her left thigh with my right knee."

4. "She dropped to the floor like a ton of bricks."

5. "She emitted the most blood curdling scream."

6. "Her claim that I slammed her head into the wall is reasonable."

7. "Her claim that I kicked her leg was also reasonable."

Jakeman admitted that he wrote each of these statements.

¶10 And when asked if "it was obvious to [him] that [AJ] was feeling pain from what [he was] doing," Jakeman testified, "It was obvious once I engage[d] her pressure point that she felt pain, because . . . she did drop to the floor and she did emit [a] terrible scream, and that's why I was like great, I'm just going to leave,

---

3. This email statement does not appear in the trial record, but it does appear in the presentencing report. However, the City explicitly referenced and extensively quoted from the email during Jakeman's cross-examination. All the portions quoted here are taken from the trial transcript.

because anybody who heard that isn't going to believe anything I say." Jakeman further admitted in his testimony to (1) telling police officers that he and AJ may have been "pushing back and forth" during the incident and (2) saying, in a subsequent phone call to Wife, that he and AJ "were pushing each other."

¶11 At the conclusion of the trial, the court found Jakeman guilty on both charges. First, the court stated that it was "persuaded by the testimony . . . that AJ's version of events [was] the more accurate version," especially since it was "corroborated by multiple other witnesses," including Jakeman himself. Indeed, the court stated that Jakeman's testimony acknowledged "he intentionally put his knee on a pressure point on [AJ's] thigh . . . in such a way that it [left] bruising." Concerning the protective order, the court found that "by his own testimony," Jakeman "threatened to hit AJ," with the evidence showing that he "did much more" when "he actually did assault his daughter and cause injury to her."

¶12 After his conviction, Jakeman filed a pro se motion for a new trial. The motion itself, which consisted of an unfocused series of assertions about errors allegedly committed by Counsel, spans seventy-five pages. It included a lengthy declaration from Jakeman, many pages of Jakeman's journal entries, and letters from two individuals addressing the delayed transport and Jakeman's character. In that motion, he asserted, as relevant here, the following:

1. "The aggregate communication between [Jakeman] and [Counsel], consisting of some letters, two phone calls, and a single hour-long meeting" resulted in a "lack of communication and lack of preparation time" so as to "materially alter the potential outcome of the trial." Moreover, Counsel did not "rehearse" with him the questions she planned to ask on direct examination.

2. Counsel "failed to cross examine [AJ] about the bruise." A proper cross-examination would have "clearly demonstrated that the cause of the bruise [was] unknown and could not have been the incident in question."

3. The delayed transport to the courthouse "was a sneaky, unfair, and unethical method of hamstringing his right to a fair trial by making it impossible for him and his attorney to prepare for trial." He "was afforded only one in-person meeting with" Counsel, which did not provide "enough time to properly or adequately prepare for trial." The delayed transport resulted in Jakeman having only "about 10 seconds" with Counsel before "being ushered into the courtroom," which wasn't "enough to cure the gigantic deficit in prior communication and preparation." Being transported late "completely and utterly eviscerated [Jakeman's] ability to convey critical information that he had due to his personal involvement in the incident" and that "[Counsel] lacked." This information was "vital to [Counsel] being able to adequately represent him during the trial."

¶13 The court considered Jakeman's motion for a new trial on the child abuse charge at a hearing in March 2024. At the outset of the hearing, the City asked for clarification of the basis of the motion. It noted that Jakeman never used the phrase "ineffective assistance of counsel" in his filings but that ineffective assistance seemed to be the basis of the motion for a new trial. Jakeman, through new counsel, responded, somewhat puzzlingly, "[R]egardless of what it's called, that's largely what we'll be focusing on today." Based on the ineffective assistance claim, Jakeman agreed that he was waiving attorney-client privileges as it related to Counsel.

¶14 Along with Jakeman, Counsel, her co-counsel (Second Chair), and an attorney with Counsel's law firm who had worked on Jakeman's case in the early stages testified at the hearing.

¶15 At the conclusion of the hearing, the court ruled on Jakeman's request for a new trial. As to the delayed transport preventing him from engaging in last-minute trial preparation, the court did not detect "an error or impropriety that had a substantially adverse effect" on Jakeman's rights. The court noted that if Jakeman wanted to fire Counsel and represent himself, he "clearly understood how to do that." The court stated,

> I don't know why he didn't speak up. He obviously could have, and he's had no problem in the past speaking up and letting the Court know his thoughts and desires on certain points.
>
> If there's an error there, it's [Jakeman's] error for not asserting himself and not letting anybody know that that's what he wanted to do. And I don't see that that's some kind of error that would rise to a level that would demand a new trial.

Based on this analysis, the court concluded that "whether or not [Counsel] met with [Jakeman] just prior to trial didn't really affect her trial preparation."

¶16 As to other deficiencies in representation (e.g., lack of communication and trial strategy), the court noted that the testimony showed there had been "extensive communications" between Jakeman, Counsel, and the other attorneys in her office. In fact, the firm's case management system documented 131 contacts (namely, phone calls, emails, and letters) with Jakeman. Through those communications, Counsel testified that she became informed about Jakeman's version of the events. The court found Counsel's recitation of her trial preparation credible, especially since it was corroborated through evidence from the case management system and the testimony of Second Chair. Given this extensive contact, the court found that Counsel was "very . . . familiar with certain defenses that [Jakeman] wanted to raise" and that "they discussed things like strategy," especially

about the advisability of Jakeman testifying. Because they "talked about all of those things," the court concluded that there were "plenty of pretrial communications that took place."

¶17 Concerning alleged deficiencies in preparing Jakeman for examination at trial, the court found that Counsel "did try to prepare [Jakeman] for his testimony," noting, "Whether or not [Jakeman] was going to heed that advice or not was completely up to him, but she did make reasonable efforts to prepare him for his testimony." Concerning the cross-examination of AJ, the court found that Counsel and Jakeman had agreed to a strategy of undermining AJ's "testimony and her credibility by demonstrating that she didn't have a clear memory of the events." Given this strategic aim, the court concluded that it didn't "see anything about [Counsel's] cross-examination of [AJ] that fell below the standard of care that a reasonable defense attorney would apply in performing cross-examination."

¶18 The court concluded, "So after having considered all of the areas that [Jakeman] raised . . . , I don't believe that he has met his burden to demonstrate that there are errors or improprieties that are so substantially adverse that it affected his rights and requires a new trial." With that, the court denied his motion for a new trial.

## ISSUES AND STANDARDS OF REVIEW

¶19 Jakeman appeals, raising the following issues. He first asserts that the conviction for child abuse was against the clear weight of the evidence. "We review a claim of insufficient evidence at a bench trial for clear error, meaning we must sustain the district court's judgment unless it is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *State v. Sparling*, 2024 UT App 59, ¶ 13, 549 P.3d 86 (cleaned up), *cert. denied*, 554 P.3d 1096 (Utah 2024). And we "accord deference to the district court's ability and opportunity to evaluate credibility and demeanor,"

deferring "to its findings unless the record demonstrates clear error." *Id.* (cleaned up).

¶20 Jakeman next contends that the court committed "structural error by conducting [the] trial" after the delayed transport to the courthouse, thus "denying him the opportunity to meet in person and conference with his attorney." "Constitutional issues are questions of law that we review for correctness." *State v. Curry*, 2006 UT App 390, ¶ 5, 147 P.3d 483 (cleaned up).

¶21 Jakeman's final claim is that Counsel rendered ineffective assistance in two ways: (1) by failing to communicate adequately with him and (2) by "directly examining Jakeman and cross-examining" AJ about the bruise "in a way that failed to explore key elements of the crime." "[W]hen a district court rules on a criminal defendant's claim that he was deprived of his Sixth Amendment right to counsel due to ineffective assistance, the district court's determination of whether the defendant received constitutionally ineffective assistance is reviewed for correctness." *State v. Torres-Orellana*, 2024 UT 46, ¶ 6, 562 P.3d 706.

ANALYSIS

I. Sufficiency of the Evidence

¶22 Jakeman first asserts that the conviction for child abuse was against the clear weight of the evidence, arguing that the "evidence before the trial court was insufficient to rise to the beyond a reasonable doubt standard to find Jakeman guilty of intentionally and knowingly inflicting upon [AJ] a physical injury." More specifically, Jakeman contends that he "took the stand . . . to provide direct evidence" of his mental state by showing that "he lacked intent to harm [AJ] in that moment" and was instead "only [seeking] to disengage." Given that Jakeman testified that he applied pressure to AJ's thigh only "in order to

safely disengage without intent to injure in what had risen to a physical encounter," he insists that the "evidence did not support intentional or knowing infliction of a physical injury."

¶23 Jakeman also claims—although his briefing is more than a little convoluted on this point—that his "use of pressure points" did not, in fact, cause AJ "physical harm." To this point, he maintains that "the evidence was insufficient to form a nexus between the bruise that appeared four . . . days later and the alleged incident." To support this argument, Jakeman points out that he testified he applied pressure to AJ's left leg, while AJ testified the bruising appeared on her right leg. "Given the disparity in their testimonies," Jakeman insists that "it was necessary for the City to draw a nexus rather than just hope for an inference to connect the bruise with this alleged incident."

¶24 Under Utah law, an "actor commits child abuse if the actor . . . inflicts upon a child physical injury." Utah Code Ann. § 76-5-109(2)(a) (LexisNexis Supp. 2023). "Physical injury" is defined as including "a bruise or other contusion of the skin" and "any other condition which imperils the child's health or welfare and that is not a serious physical injury." *Id.* § 76-5-109(1)(a)(ii). Where, as here, a defendant is charged with a class A misdemeanor, the infliction of physical injury must be "done intentionally or knowingly." *Id.* § 76-5-109(3)(a). Intentionally applying one's knee to a child's thigh with such force that it leaves a bruise obviously meets the elements of child abuse by inflicting physical injury as defined in the statute.

¶25 Jakeman's conviction was supported by ample evidence of both (1) his intent and (2) the actual physical injury he caused when he assaulted AJ.

¶26 Jakeman asserts that he could not have intentionally and knowingly inflicted physical injury on AJ because his purpose for applying his knee to AJ's leg "was to avoid injury and safely disengage from the confrontation." While Jakeman encourages us

to credit his testimony on this point, other evidence indicates that Jakeman acted with the requisite intent.

¶27 "Proof of a defendant's intent is rarely susceptible of direct proof. Accordingly, circumstantial evidence has long been used to prove specific intent." *State v. Heath*, 2019 UT App 186, ¶ 54, 453 P.3d 955 (cleaned up); *see also State v. James*, 819 P.2d 781, 789 (Utah 1991) ("It is well established that intent can be proven by circumstantial evidence."). "Direct evidence is not required. Sustainable verdicts are entered every day on the sole basis of circumstantial evidence. And where the [factfinder] returns a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold [that] verdict." *State v. Kitzmiller*, 2021 UT App 87, ¶ 38, 493 P.3d 1159 (cleaned up). When proving intent by circumstantial evidence, we employ a two-step process. First, we determine "whether the [prosecution] presented any evidence that [the defendant] possessed the requisite intent." *State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 (cleaned up). Second, we consider "whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent." *Id.* (cleaned up).

¶28 The strongest evidence the City presented that Jakeman possessed the requisite intent came from Jakeman's own mouth. He admitted that he told AJ that "if she kept on as she was doing [he] would hit her." And Jakeman also testified that his feelings had been so "totally hurt" that he went up the stairs to engage in a "standoff" that he was determined to "win." Even after Jakeman and AJ had locked arms and he realized how frail and terrified she looked, Jakeman said that he thought to himself, "[B]ut I'm still going to win this stupid standoff."

¶29 And he made sure that he won by striking AJ in the leg in an area that he repeatedly described as a "pressure point." The obvious inference is that he knew enough about human anatomy

to know that striking a "pressure point" would cause a person disabling pain. "A person engages in conduct . . . with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result." Utah Code Ann. § 76-2-103(1) (LexisNexis 2017). And a "person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 76-2-103(2). Thus, because Jakeman knew that striking (or applying significant pressure to) AJ's leg would cause her pain, his conduct was both intentional and knowing.

¶30   There is simply no doubt that Jakeman intentionally and knowingly meant to apply his knee to a part of her body—"a pressure point"—in such a way to cause AJ severe pain. The inference, based "in logic and reasonable human experience," *Holgate*, 2000 UT 74, ¶ 21 (cleaned up), is obvious: Jakeman, a grown man, had his feelings hurt by the words of a child and got so mad that he decided he was going to overpower her and hurt her. After the two locked arms, Jakeman decided he wanted "to be done with" the standoff, and he effected that desire by intentionally applying pressure to AJ's thigh with his knee. He knew this spot on her thigh was a "pressure point" and he knew that forcing his knee into that spot would cause AJ enough pain to make her let go—that was, after all, the reason he bore his weight down at a vulnerable spot on AJ's thigh. And so Jakeman accomplished his goal: AJ let go, dropped to the ground, and screamed in pain. Thus, Jakeman's claim that the City provided insufficient evidence to show he intentionally and knowingly caused physical harm to AJ fails.

¶31   There was also sufficient evidence that Jakeman's act of striking or applying significant pressure to AJ's leg caused her physical injury. After all, there was a photograph admitted into evidence of the bruise AJ claimed to have received after Jakeman's contact with her. The factfinder was well-equipped to come to this

conclusion based on the photographic evidence alone. "Whether the mark constituted a bruise and what caused it did not involve obscure medical factors but were within the common experience of laypersons." *State v. Whitchurch*, 2024 UT App 108, ¶ 54, 554 P.3d 1166 (cleaned up), *cert. denied*, 564 P.3d 960 (Utah 2025). And simply because Jakeman insists that he applied force to AJ's left leg while she said the bruise appeared on her right leg does not mean the evidence was insufficient. Contradictory evidence does not insufficiency make. "When reviewing a trial wherein conflicting, competent evidence was presented, we simply assume that the [factfinder] believed the evidence supporting the verdict. Accordingly, the existence of contradictory evidence or of conflicting inferences does not warrant disturbing the . . . verdict." *State v. Boyd*, 2001 UT 30, ¶ 14, 25 P.3d 985 (cleaned up). And here, the trial court determined that AJ was the more credible witness to the events. Indeed, the court explicitly stated that it was "persuaded by the testimony . . . that AJ's version of events [was] the more accurate version," especially since it was "corroborated by multiple other witnesses."[4]

¶32 Given that Jakeman admitted to applying pressure to AJ's leg, that AJ said the blow happened to her right leg, and that AJ had a bruise to show for Jakeman's conduct, it certainly was not against the clear weight of the evidence that Jakeman's conduct caused physical injury to AJ. Accordingly, this claim of error also fails.

## II. Structural Error

¶33 Jakeman next contends that the court committed "structural error by conducting [the] trial" after the delayed transport to the courthouse, thus "denying him the opportunity

---

4. The evidence included the police body camera video in which JJ explicitly stated that Jakeman had "hit" AJ. *See supra* ¶ 5. Jakeman made no objection to the body camera video at trial.

to meet in person and conference with his attorney." Jakeman develops this issue as a denial of his Sixth Amendment right to counsel, arguing that "[n]o attorney could provide assistance given the circumstances of the late transport."

¶34   "[S]ome constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error . . . ." *Chapman v. California*, 386 U.S. 18, 23 (1967). These are known as "structural errors." *Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017). "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Id.* at 294–95 (cleaned up).

¶35   Jakeman has pointed us to no case that supports a delayed arrival infringing on a defendant's additional consultation time with counsel as constituting structural error. Rather, he argues in more general terms, asserting that a structural error occurred in his case because "the breakdown in communication" between him and Counsel was "severe enough to prevent preparation or adequate representation." *See United States v. Soto Hernandez*, 849 F.2d 1325, 1328 (10th Cir. 1988) ("A complete breakdown in communication between an attorney and client may give rise to [a presumption of ineffectiveness]. . . . [A] breakdown in communication between an attorney and his or her client can be severe enough to prevent even the most able counsel from providing effective assistance."). Jakeman argues that he had "planned to meet with [Counsel] an hour or more before trial so that he could determine whether they were on the same page regarding his defense and possibly represent himself at trial if necessary," but "when he arrived almost an hour late, [Counsel] was waiting for him outside the courtroom and told him she had found a favorable case that required the [City] prove intent to cause injury for him to be found guilty." He contends that

"[b]ased upon the lack of time, the rushed state of the proceedings, . . . the favorable case she had found, and her positive outlook, he did not attempt to proceed with the pre-trial meeting they had previously agreed to, fire her, nor discuss the matter in-depth with her." From this, he concludes that the "trial court knew or should have known this late transport caused structural error that weighed against [him]." Jakeman points us to no authority establishing that this circumstance, even if true, would constitute structural error.

¶36 Moreover, Jakeman is mistaken in his reading of the facts of this case. To be clear, there was no error here, structural or otherwise, to serve as a basis for the relief Jakeman seeks. Simply put, the delayed transport did not infringe upon any of Jakeman's constitutional rights. Counsel testified that there "was no new information coming" to her from Jakeman on the day of trial. Counsel said that instead of discussing trial strategy, she and Jakeman spent about fifteen minutes "going over his rights." She further stated that she had "enough time to ask him multiple times" if he was comfortable with "going forward," adding that there were "no stressors or undue pressure with the time." Moreover, no court personnel (e.g., bailiffs or clerks) came into the holding area during their pretrial conversation telling them they had to wrap up. Instead, Counsel said that no sort of restrictive timeframe was communicated to her for the pre-trial consultation, nor was there "any sort of impetus for [her] to rush [her] conversation" with Jakeman.

¶37 Second Chair testified that Jakeman's late arrival, while unanticipated, did not "throw a wrench into things," noting that he was "not aware of any preparation that needed to be done" on the day of the trial: "I don't recall any tension, in my mind, that we weren't prepared, we needed things to be addressed prior to the trial, things like that." Indeed, Second Chair explicitly stated that "there wasn't any issue in [his] mind whether [Counsel] was prepared" on the day of trial. Additionally, Second Chair testified

that Counsel was not rushed during her pre-trial conversation with Jakeman, that they were not interrupted by court personnel during that conversation, and that there was no indication from the court that it was anxious to get started. He did say that during the pre-trial conversation, Jakeman expressed that "his method of cross-examination would've been the best because he was there," but Jakeman had the opportunity to ask Counsel questions. Second Chair further testified that Jakeman did not express concerns about "being able to present the trial because of the lateness of his transportation." Instead, Jakeman "wanted to rehash all the things that [they] had [previously] discussed in the jail and about examining the trial ethics."

¶38 In short, there simply was no error here. The evidence indicates that Jakeman had all the time he needed before trial to discuss his case with Counsel. Jakeman was provided with legal representation, and Counsel was prepared for trial. Jakeman had the opportunity to meet with Counsel and express any lingering concerns or reservations he might have had. Accordingly, Jakeman's assertion of structural error fails both legally and factually.

### III. Ineffective Assistance of Counsel

¶39 Jakeman's final claim of error is that he received constitutionally ineffective assistance of counsel on two fronts. First, he asserts that Counsel failed to adequately communicate with him before trial. Second, he maintains that Counsel failed to adequately examine Jakeman and AJ about the bruise.

¶40 To succeed on a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984): "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. The deficient performance prong requires a defendant to "show that counsel's representation fell below an

objective standard of reasonableness." *Id.* at 688. "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," meaning that a defendant must overcome the presumption that counsel's action "might be considered sound trial strategy." *Id.* at 689 (cleaned up). Thus, if it "appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance." *State v. Ray*, 2020 UT 12, ¶ 34, 469 P.3d 871. "To establish prejudice, the defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Torres-Orellana*, 2021 UT App 74, ¶ 29, 493 P.3d 711 (cleaned up), *aff'd*, 2024 UT 46, 562 P.3d 706. Finally, "a defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *Id.* ¶ 27 (cleaned up).

A.      Lack of Communication

¶41    Jakeman asserts that he met with Counsel for only one hour face-to-face before the day of the trial and very briefly right before trial. And even though there were many remote communications between him and Counsel, he complains that how those communications related to trial preparation was not explored and remained unknown.

¶42    "Under *Strickland*, we must indulge a strong presumption that counsel's conduct *did* fall within the wide range of reasonable professional assistance." *State v. Draper*, 2024 UT App 152, ¶ 99, 560 P.3d 122 (cleaned up). Jakeman fails to meet the burden of overcoming this presumption. Instead, his claim that Counsel didn't adequately communicate with him is almost entirely conclusory; in other words, he asserts that Counsel's communication was deficient, but he doesn't attempt to explain *how* it was deficient. It appears that he believes that Counsel's

communication efforts were deficient because he was convicted, but that is not the standard for deficiency. Instead, he needs to show that Counsel's communication "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. He has not done so, and the record indicates that the communication between Counsel and Jakeman was robust.

¶43 While Jakeman met with Counsel in-person only twice, Jakeman does not address all the other preparation Counsel undertook in reading, analyzing, and developing a strategy from the material he submitted to her in his many communications. *Cf. Draper*, 2024 UT App 152, ¶ 99 (declining to find deficient performance in a case where a defendant "met with [c]ounsel only twice" but said "nothing about how long those meetings were"). The United States Supreme Court has cautioned against retrospective micromanagement of attorney practice in assessing deficient performance. *See Strickland*, 466 U.S. at 690 ("The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. . . . Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client."). And we have declined "to determine what amount of time counsel must spend with a defendant to ensure that the representation does not fall below an objective standard of reasonableness." *State v. Bair*, 2012 UT App 106, ¶ 57, 275 P.3d 1050 (cleaned up); *see also Nicholls v. State*, 2009 UT 12, ¶ 38, 203 P.3d 976 ("We have refused to hold that counsel is ineffective based on the amount of time counsel spent working on the case or consulting with a client."); *Parsons v. Barnes*, 871 P.2d 516, 526 (Utah 1994) (stating that "the time period" required to ensure adequate representation "will vary with every case"). Instead, our caselaw has considered whether an attorney "spent sufficient time" working on a case, *Nicholls*, 2009 UT 12, ¶ 38, so as to ensure

that there was no "overlooked information critical to the defense," *Parsons*, 871 P.2d at 526.

¶44   Here, Jakeman has failed to demonstrate that Counsel spent too little time meeting with him and developing a strategy for the case. In fact, the record points in the other direction, demonstrating that Counsel was well-prepared for the case. Counsel's law firm documented 131 communications with Jakeman, including phone calls, texts, emails, letters, and meetings. These communications concerned how Jakeman "would like to proceed with his" case. In preparation for her meeting with Jakeman at the jail, Counsel had gone through the "numerous documents" Jakeman had sent her, noting his "questions and concerns." She determined it was "more appropriate for [her] to go through them [on her own] time, write down [her] response, and visit him at the jail." Counsel subsequently went "through the letters in detail" during her meeting with Jakeman at the jail. In addition to answering Jakeman's questions during the jail meeting, Counsel discussed trial strategy, who would be called as witnesses, and Jakeman's desire to testify. Counsel noted, "[Jakeman] decided he would like to testify at trial, and we went over what he would testify to, what should be said, and what manner he should answer questions on the stand." Additionally, Counsel had conversations with Jakeman "[m]ultiple times" during which he "relayed . . . his version of events." Counsel was also familiar with Jakeman's account of the incident based on letters he had sent. She indicated that Jakeman had sent "at least five packets, each containing anywhere between 20 and 60 pages" to her law firm. She subsequently reviewed those packets and used the information she gleaned from them to review in person with Jakeman trial strategy, admissibility of evidence, and any other questions Jakeman had. Counsel testified that Jakeman never objected to her proposed strategy during these discussions.

¶45 Counsel also noted that Jakeman "wanted his side of the story to be heard" and "did not care what the outcome was." During their discussions, Counsel advised Jakeman that it would be harmful to his case to state that he said he was going to hit AJ and that he shouldn't "testify to that unless asked directly." In addition, Counsel advised Jakeman "to be honest, . . . straightforward, controlled, and direct in his answers and not to get off-topic." Counsel testified that her coaching of Jakeman was part of a strategic decision "[t]o keep it clear, to keep it concise, and to ensure the points that [they] wanted to get across came across in the correct way." In short, there is every indication that Counsel undertook extensive preparation for trial and developed a trial strategy in accord with Jakeman's objectives. There is simply no foundation in the record that Counsel's communication efforts fell short of the standard expected of reasonable counsel in any way.

¶46 Accordingly, the trial court's findings about the extent of communication between Jakeman and Counsel were not clearly in error. And these communications represent the efforts objectively reasonable counsel would take to ensure adequate representation. Thus, this claim of ineffective assistance fails because Jakeman has not shown deficient performance.

B. Testimony About the Bruise

¶47 Jakeman also asserts that Counsel was ineffective for failing to directly examine him and cross-examine AJ with regard to the bruising on her leg. Jakeman claims that this shortcoming resulted in a failure "to subject the City's case to proper adversarial testing" because it prevented the presentation of "proper and necessary evidence."

¶48 "In evaluating the reasonableness of an attorney's actions, courts will often look to whether the actions the attorney took were motivated by trial strategy." *State v. King*, 2024 UT App 151, ¶ 24, 559 P.3d 96. Here, we have no trouble articulating a

reasonable trial strategy for how Counsel handled the bruise testimony.

¶49    Counsel was pursuing a strategic purpose in limiting her cross-examination of AJ. She testified that she deliberately kept cross-examination "brief" because she wanted "to elicit a certain response," "get what [she needed] from the case," and not "leave room for someone on cross-examination to add details that could potentially help the prosecutor." Instead of delving into the bruise, Counsel explained that her strategy in cross-examining AJ was to go after her credibility. Specifically, Counsel focused on AJ's initial report that Jakeman had slammed her head into the wall. By getting AJ to admit that Jakeman never slammed her head against the wall, Counsel aimed to "undercut her testimony." Moreover, Counsel elicited testimony from AJ that her memory of the events was "foggy" and "brought back to her via other people's recollections." Based on these responses, Counsel felt she had established that AJ was "an uncredible witness." Counsel explained, "Her testimony was based on what others had told her, and she had changed her story between the written statement she provided to officers, what she told the officers that day, and what she had stated on the stand."

¶50    And having introduced evidence indicating that AJ was an unreliable witness, Counsel made the strategic decision to stop her cross-examination of AJ, a decision that was also informed by AJ's age. Counsel explicitly stated that she wanted to avoid asking questions of AJ that would come off as "badgering," explaining,

> I do take the time to think out the questions asked, especially when it's a child, and try and phrase it in a non-threatening-type way. It is intimidating for a child to testify, so I asked her everything I wanted to that day. I just made sure I worded it in a way that she would feel more comfortable.

¶51    Moreover, additional questioning of AJ about the bruise could have resulted in more vivid testimony about how painful the blow to her leg had been and how that pain was confirmed by the development of a bruise in the days following the incident; such testimony would certainly not have benefited Jakeman in any way. Thus, given that Counsel articulated a reasonable strategic purpose in limiting her questioning of AJ to issues of credibility, the trial court did not err in rejecting Jakeman's ineffective assistance claim.

¶52    As to the direct examination of Jakeman about the bruise, Jakeman does little to develop this point in his briefing other than asserting that he should have been directly examined "on this point to effectively establish the discrepancy." But Counsel had good reason not to question Jakeman about the bruise. First, Jakeman testified that he applied pressure to AJ's left thigh, while AJ said the bruise was on her right thigh. We fail to see the value of asking Jakeman specifically about the bruise when his other testimony established that, in his account of the event, he could not have caused it since he asserted that he applied pressure to the thigh without the bruise. More importantly, direct examination of Jakeman about the bruise may have led to damaging testimony—such as Jakeman saying that AJ was being deceptive or had fabricated the injury. Counsel—perhaps aware that Jakeman did not present a terribly sympathetic defendant— could reasonably have wanted to keep him from doing damage by straying off track in his testimony. Thus, questioning him about the bruise would have been, at best, pointless and, more likely, counterproductive.

¶53    Thus, since Counsel had a reasonable strategic purpose to limit testimony about the bruise, we conclude that this claim of ineffective assistance fails for lack of deficient performance.

CONCLUSION

¶54 Jakeman's convictions were supported by sufficient evidence, both as to his intent and the fact that he caused physical injury to AJ. His delayed transport to the courthouse did not result in error, structural or otherwise. And Counsel did not perform deficiently in either respect identified by Jakeman.

¶55 Affirmed.

———————